**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - -  x

**UNITED STATES OF AMERICA**              :

    - v. -                                    :
                                                            **S2 04 Cr. 356 (JFK)**
**OUSSAMA ABDULLAH KASSIR,**              :
  a/k/a "Abu Abdullah,"
  a/k/a "Abu Khadija,"                    :

              **Defendant.**          :

- - - - - - - - - - - - - - - - - - - - - - - - - - -  x

**GOVERNMENT'S MEMORANDUM OF LAW IN RESPONSE TO
THE MOTION TO LIFT THE SPECIAL ADMINISTRATIVE MEASURES
THAT HAVE BEEN IMPOSED ON THE DEFENDANT**

                     **MICHAEL J. GARCIA**
                     **United States Attorney**
                     **Southern District of New York**
                     **Attorney for the United States of America**

**Michael Farbiarz**
**Assistant United States Attorney,**
  **Of Counsel.**

## **Table of Contents**

I.     Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    The Motion Should Be Dismissed For Failure To Exhaust Remedies . . . . . . . . . . . . . . . 3

      A.    The PLRA Applies and Kassir Has Not Exhausted Available Remedies . . . . . . . 3

      B.    Kassir's Counter-Argument — That The PLRA Does
            Not Apply Here — Is Not Persuasive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.   The SAMs Motion is Meritless . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      A.    The SAMs Do Not Violate Kassir's Right to Counsel . . . . . . . . . . . . . . . . . . 15

      B.    The SAMs Have A Sufficient Factual Basis . . . . . . . . . . . . . . . . . . . . . . . . . 20

      C.    Kassir's Disciplinary History Is Immaterial
            To the Constitutionality of the SAMs . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

      D.    The Defendant's Miscellaneous Claims Are Meritless . . . . . . . . . . . . . . . . . . 22

IV.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - -    x

UNITED STATES OF AMERICA          :

   - v. -                                   :

                                          **S2 04 Cr. 356 (JFK)**

**OUSSAMA ABDULLAH KASSIR,**          :
  **a/k/a "Abu Abdullah,"**
  **a/k/a "Abu Khadija,"**               :

         **Defendant.**          :

- - - - - - - - - - - - - - - - - - - - - - - - - - -    x

## GOVERNMENT'S MEMORANDUM OF LAW IN RESPONSE TO THE MOTION TO LIFT THE SPECIAL ADMINISTRATIVE MEASURES THAT HAVE BEEN IMPOSED ON THE DEFENDANT

The Government respectfully submits this Memorandum of Law in response to the Motion to Lift the Special Administrative Measures That Have Been Imposed on the Defendant ("SAMs Motion"), filed on May 19, 2008 by the defendant, Oussama Abdullah Kassir a/k/a "Abu Abdullah," a/k/a "Abu Khadija" ("Kassir" or "the defendant"), and accompanied by a Memorandum of Law ("Def. Memo").

As set forth below, the SAMs Motion should be denied because the defendant has failed to exhaust administrative remedies, as required under the Prison Litigation Reform Act. See infra Part II.  Substantively, the claims pressed in SAMs Motion fail; accordingly, should the Court reach the merits, the SAMs Motion should be denied.  See infra Part III.

## I.    BACKGROUND

On February 6, 2006, a superseding Indictment ("Indictment") was filed that charged Kassir, as well as two co-conspirators, with various terrorism-related offenses.

On September 25, 2007, the defendant was brought to the United States from the Czech Republic, following an extradition proceeding. Kassir was arraigned on September 25th, and detained. Since September 25, 2007, Kassir has been imprisoned at the Metropolitan Correctional Center ("MCC") in Manhattan.

By letter dated September 26, 2007 to a component of the United States Department of Justice, the United States Attorney for the Southern District of New York requested, pursuant to 28 C.F.R. § 501.3(c), that special administrative measures ("SAMs") be imposed upon Kassir. Along with the referenced September 26th letter, the United States Attorney conveyed a memorandum ("Supporting Memorandum"). The Supporting Memorandum is attached herewith as Exhibit A.

As described in the Supporting Memorandum, Kassir was a follower of the radical Islamic cleric Abu Hamza al-Masri. See Ex. A (Supporting Memorandum) at 1. Along with, among others, a particular co-conspirator ("CC-1"),[1] Kassir provided support to al-Qaeda by coming to the United States and attempting to establish a Jihad training camp in Bly, Oregon. See id. Kassir told witnesses in the United States that he supported al-Qaeda and Usama Bin Laden, and that he had previously undertaken jihad training in, among other places, Afghanistan, Lebanon, and Kashmir. See id. In the United States, Kassir was also seen in possession of a compact disk that contained information on making bombs and poisons. See id. Furthermore, while at Bly, Kassir threatened to kill CC-1 and bury him on the property at Bly, because, in Kassir's view, there were too few men at the Bly property for Kassir to train. See id. In addition, the Supporting Memorandum noted that Kassir has been charged with developing and operating

---

[1] CC-1 is referred to in the Indictment as CC-2.

several extremist websites which promoted terrorism and that disseminated terrorist manuals, such as "The Mujahiden Exlposives Handbook" and "The Mujahiden Poisions Handbook." See id.

The Acting Attorney General, Peter D. Keisler, by memorandum to the Director of the Federal Bureau of Prisons dated October 25, 2007 ("Attorney General Memorandum"), requested that certain enumerated SAMs be imposed on Kassir. See Exhibit B (Attorney General Memorandum and SAMs). The Attorney General Memorandum described some of the information enumerated in the Supporting Memorandum, and also provided certain additional information. See id. at 1. For example, the Attorney General Memorandum indicated that "[t]he purpose of the Bly jihad training camp was to provide a place where terrorists could receive various types of training, including military training to gain familiarity with weapons or to prepare for additional military training in Afghanistan." Id.

On May 19, 2008, Kassir moved to lift the SAMs that have been imposed on him, claiming that the SAMs violate various provisions of the United States Constitution. See SAMs Motion passim.

As set forth below in Part II, the SAMs Motion should be dismissed because Kassir has failed to exhaust available administrative remedies. As set forth below in Part III, the SAMs Motion is baseless; accordingly, should the Court reach the merits, the SAMs Motion should be denied.

## II.    THE MOTION SHOULD BE DISMISSED FOR FAILURE TO EXHAUST REMEDIES

### A.    The PLRA Applies and Kassir Has Not Exhausted Available Remedies

Pursuant to the Prison Litigation Reform Act ("PLRA"), "no action shall be

brought with respect to prison conditions under . . . Federal law, by a prisoner . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). When the PLRA applies, exhaustion of administrative remedies is required. See Woodford v. Ngo, 548 U.S. 81, 85 (2006) ("The PLRA strengthened this exhaustion provision in several ways. Exhaustion is no longer left to the discretion of the district court, but is mandatory."). As set forth below, the PLRA applies here, and Kassir has not exhausted his administrative remedies. Therefore, the SAMs Motion should be dismissed.

Kassir is plainly a "prisoner," 42 U.S.C. § 1997e(a), and his SAMs claims arise "under . . . Federal law," id. — that is, under the various provisions of the United States Constitution cited in the SAMs Motion. Furthermore, the SAMs Motion is, on its face, a challenge to Kassir's "prison conditions," id. — because the SAMs Motion is concerned exclusively with how the defendant is being treated at the MCC.

In addition, administrative remedies are available for federal prisoners, such as Kassir, who challenge SAMs that have been imposed on them. See generally id. (requiring exhaustion of administrative remedies "as are available"). The Bureau of Prisons ("BOP") maintains a grievance program, referred to as the Administrative Remedy Program ("BOP Program"),[2] see 28 C.F.R. Part 542, and the governing federal regulations explicitly state that SAMs may be reviewed by means of the BOP Program. See 28 C.F.R. § 501.3(e) ("The affected

---

[2]    The BOP Program provides a four-step process. In the first step, a prisoner submits a request for informal resolution of the problem. See 28 C.F.R. § 542.13. In the second step, the prisoner submits a formal Request for Administrative Remedy for decision by the warden. See id. §§ 542.11(a)(4), 542.14. In the third step, the prisoner appeals to the Regional Office. See id. §§ 542.11(a)(4), 542.15. In the fourth step, the prisoner appeals to BOP's Central Office. See id. § 542.15.

inmate may seek review of any special restrictions imposed in accordance with paragraph (a) of this section [which empowers the Attorney General to impose SAMs] through the Administrative Remedy Program, 28 CFR part 542.").[3]

Although administrative remedies are available, Kassir has not exhausted them. A June 2008 review of relevant records by an MCC attorney reveals that Kassir filed one administrative grievance, on or about February 22, 2008. That same day, the filing was rejected because Kassir did not provide evidence of an attempt at informal resolution of his grievance, as required by the governing regulations. See supra n.2 (describing the four-step BOP Program). Kassir was afforded an opportunity to revise and then re-file his request for relief; he did not do so, however, and he did not file an appeal from the February 22nd denial of relief with either the BOP Regional Office or the BOP Central Office. See supra n.2.

In sum, Kassir is a prisoner pressing claims that arise under federal law, and that concern the conditions of his confinement. Even as there are legally sufficient administrative remedies available to him, Kassir has chosen not to exhaust them. Accordingly, under the PLRA, the SAMs Motion must be dismissed.

B.    Kassir's Counter-Argument — That The PLRA Does Not Apply Here — Is Not Persuasive

Against the conclusion that the SAMs Motion must be dismissed for failure to

---

[3] Prison administrative remedies must be exhausted only so long as those remedies "afford 'the possibility of some relief for the action complained of.'" Abney v. McGinnis, 380 F.3d 663, 667 (2d Cir. 2004) (quoting Booth v. Churner, 532 U.S. 731, 738 (2001)). With respect to SAMs grievances, the BOP Program affords the requisite possibility of real relief. See Yousef v. Reno, 254 F.3d 1214, 1220-21 (10th Cir. 2001) (so holding). This is because even after the Attorney General has requested that SAMs should be imposed, see Ex. B (Attorney General Memorandum and SAMs), BOP officials have discretion with respect to whether and how to impose particular SAMs. See Yousef, 254 F.3d at 1220-21.

exhaust available remedies, Kassir contends that the PLRA is inapplicable here. On Kassir's view, the PLRA applies when a prisoner's claims are pressed in a free-standing complaint that initiates a new lawsuit — but not when such claims are raised, as here, by a motion made in the course of a pending criminal case. See SAMS Motion at 5.

In advancing this argument, however, Kassir simply does not mention the various precedents that flatly contradict his interpretation of the PLRA. In United States v. Al-Marri, 239 F. Supp. 2d 366 (S.D.N.Y. 2002), for example, in the course of a criminal case, Judge Marrero denied the defendant's motion to be released from the Special Housing Unit at the MCC, for failure to satisfy the PLRA's exhaustion requirement. See id. at 367-68.

Similarly, in United States v. Abu Ali, 396 F. Supp. 2d 703 (E.D. Va. 2005), in the course of a criminal case, the Court denied the defendant's motion challenging SAMs restrictions, for failure to satisfy the PLRA's exhaustion requirement. See id. at 704-05. On June 6, 2008, this decision was affirmed by the Fourth Circuit: "[The prisoner] contends that the imposition of these SAMs was [improper]. We do not have jurisdiction to consider this claim. Federal regulations prescribe a mechanism by which inmates may appeal SAMs, see 28 C.F.R. § 501.3(e), and, as the district court found, the defendant has not yet taken advantage of this mechanism. The defendant must exhaust his administrative remedies before challenging the SAMs in federal court." United States v. Abu Ali, – F.3d –, 2008 WL 2315664 at *21 (4th Cir. 2008) (citations omitted).

Finally, in United States v. Antonelli, 371 F.3d 360 (7th Cir. 2004), the prisoner raised his conditions-of-confinement claim by filing a motion under the docket number of his (then-dormant) criminal case. Looking past the form of the motion to its substance, the Seventh

Circuit observed that "what [the prisoner] filed is not a motion in the [then-dormant] criminal case but in actuality a separate, unrelated civil challenge to a BOP policy." Id. at 361; see also id. (noting that the prisoner's criminal motion "is appropriately seen as an attempt to commence a new civil suit"). The Seventh Circuit held that the prisoner could not "evade[]" the requirements of the PLRA by couching his conditions of confinement claims as a criminal motion. Id.; see also id. at 362 ("[p]risoners who play games to avoid the PLRA should not expect courts to cooperate") (internal quotation marks and citation omitted).

In sum, Al-Marri, Abu Ali, and Antonelli hold that the PLRA requires prisoners to exhaust administrative remedies — regardless of whether the prisoner presses his conditions-of-confinement challenge in a criminal motion. This makes sense. If the Al-Marri/Abu Ali/Antonelli rule did not prevail — if, as Kassir suggests, prisoners could seek relief in federal court without first exhausting available remedies, so long as they couched their claims in a motion — the PLRA's mandatory exhaustion provisions would be subverted over and over again, as prisoners in thousands of run-of-the-mill cases come to realize that they can entirely sidestep the strictures of the PLRA by the simple expedient of pleading their conditions of confinement claims as criminal motions, and not as civil complaints.[4]

The Al-Marri/Abu Ali/Antonelli rule is consistent with Supreme Court and Second Circuit precedent — in a way that Kassir's proposed interpretation of the PLRA is not. As Antonelli emphasizes, whether exhaustion is required under the PLRA should not turn on questions of form (whether a claim is made in a motion or in a complaint), but on questions of

---

[4] According to a database search performed by BOP officials on June 3, 2008, there are over 7,000 federal pre-trial detainees in the custody of the BOP, and, between them, the MCC and the MDC hold about 3,200 total prisoners.

substance (what the gravamen of the claim is). See id. at 361-62. This approach is consistent

with the Supreme Court's decision in Porter v. Nussle, 534 U.S. 516 (2002). In Porter, a prisoner

argued that the phrase "prison conditions" in the PLRA does not encompass a single instance of

excessive force, such that he should be exempted from the statute's exhaustion requirement. See

id. at 529-31. The Court rejected this argument: "It seems unlikely that Congress, when it

included in the PLRA a firm exhaustion requirement, meant to leave the need to exhaust to the

pleader's option." Id. at 530 (citing Preiser v. Rodriguez, 411 U.S. 475, 489-90 (1973) ("It

would wholly frustrate explicit congressional intent to hold that [prisoners] could evade this

[exhaustion] requirement by the simple expedient of putting a different label on their

pleadings.")). If the PLRA were interpreted as Kassir suggests, then pre-trial detainees could

simply opt out of the PLRA's exhaustion requirements by pleading their conditions of

confinement claims in a motion, and not in a complaint. Exhaustion would thus be left to "the

pleader's option," id. — precisely what the Supreme Court in Porter warned against. See id.

(citing Preiser).

      The Al-Marri/Abu Ali/Antonelli rule finds further support in the Second Circuit's

decision in In re Nagy, 89 F.3d 115 (2d Cir. 1996). Nagy construed those provisions of the

PLRA that govern the filing fees that must be paid by prisoners who bring, or appeal from, a

"civil action." See 28 U.S.C. § 1915(a)(2). In Nagy, Judge Patterson directed that an

incarcerated criminal defendant undergo a psychiatric evaluation, in order to determine his

competence to stand trial. The prisoner then moved to have Judge Patterson recused from the

case — and then filed a petition for a writ of mandamus in the Court of Appeals to compel Judge

Patterson to pass on the recusal motion. To determine whether the prisoner could proceed in the

8

Court of Appeals without paying a filing fee, the Second Circuit considered whether a petition

for a writ of mandamus, filed originally in the Court of Appeals, constitutes a "civil action"

within the meaning of the PLRA. See Nagy, 85 F.3d at 116-17. The Court of Appeals

emphasized that the dispositive question was not whether, as a technical matter, a petition for a

writ of mandamus is a "civil action." Rather, the Court of Appeals held that whether a particular

filing constitutes a "civil action" for the purposes of the PLRA depends on the substance of the

prisoner's claims. See id. If the prisoner seeks relief "comparable" to the relief that might be

afforded in a traditional 42 U.S.C. § 1983 suit, the PLRA applies — regardless of the form that

the request for relief takes. See id. As the Second Circuit explained:

> Congress enacted the PLRA to curb the increasing number of civil lawsuits
> filed by prisoners, most of which concern prison conditions. As to such lawsuits,
> Congress wanted prisoners to feel the deterrent effect of liability for filing fees so
> that frivolous lawsuits would not be filed. It is reasonable to assume that Congress
> wished to apply the PLRA's deterrent effect to prisoners' complaints, regardless of
> the type of pleading filed by the prisoner to obtain relief. Thus, if a prisoner,
> contemplating the filing of a complaint against prison officials under 42 U.S.C. §
> 1983, decided to avoid liability for filing fees and instead sought comparable relief
> by applying for a writ of mandamus directed to a prison official, the PLRA
> provisions should normally apply. However, if a prisoner seeks a writ of
> mandamus directed to a judge conducting a criminal trial, the application is not
> within the category of lawsuits to which the PLRA was aimed.

Id. at 117. Appended to this paragraph was a footnote that read: "[w]hether the PLRA applies to

a writ of mandamus directed to a judge conducting a civil lawsuit would normally depend on

whether the writ was simply an alternative device for obtaining the relief sought in civil actions

that are covered by the PLRA." Id.

Nagy makes it clear that Kassir's interpretation of the PLRA is not tenable. Under

Nagy, the PLRA applies "regardless of the type of pleading filed by the prisoner to obtain relief,"

so long as the prisoner's claims are "comparable" to the relief that would typically be sought in a § 1983 suit. Id. Kassir's claim that his conditions of confinement violate federal law is very much the sort of claim that would generally be pressed in a § 1983 suit. Accordingly, the PLRA applies — and it is immaterial that Kassir's SAMs claims are couched as a motion, and not as a new lawsuit. The SAMs Motion is simply an "alternative device," id., for challenging Kassir's conditions of confinement. Accordingly, it is subject to the strictures of the PLRA.

In sum, Kassir's intereperetation of the PLRA's exhaustion requirement is not persuasive. It flies in the face of the rule articulated in Al-Marri, Abu Ali, and Antonelli; it would permit thousands of pre-trial detainees immediately to file conditions of confinement claims, without first pursuing administrative remedies; it would raise form over substance in the manner that the Supreme Court cautioned against in Porter; and it cannot be reconciled with the Second Circuit's decision in Nagy.

*   *   *

In support of his interpretation of the PLRA, Kassir cites United States v. Ayala-Lopez, 327 F.Supp.2d 138 (D. P.R. 2004), and United States v. Hashmi, 06 Cr. 442 (LAP), 2008 WL 216936, (S.D.N.Y. 2008) (Preska, J.). Ayala-Lopez and Hashmi are based on this line of reasoning: the PLRA's exhaustion requirement applies to a prisoner's "action," see Hashmi, 2008 WL 216936 at *7 (citing 42 U.S.C. U.S.C. § 1997e(a)); an "action" is "[a] civil or criminal judicial proceeding," see Hashmi, 2008 WL 216936 at *7 (quoting Black's Law Dictionary 28 (8th edition 2004))[5]; and a conditions of confinement motion does not fit within this definition of

---

[5]  Cf. Freeman v. Francis, 196 F.3d 641, 643-44 & n.2 (6th Cir. 1999) (indicating that certain terms in the PLRA should be defined with reference to 18 U.S.C. § 3626(g)(2), which suggests that "civil action" and "civil proceeding" are interchangeable).

"action" because it does not "initiat[e] . . . a new lawsuit[.]" <u>Hashmi</u>, 2008 WL 216936 at *7.

Accordingly, <u>Hashmi</u> and <u>Ayala-Lopez</u> hold, the PLRA does not apply to motions, and

exhaustion of administrative remedies is not necessary.

However, this argument is flawed. If an "action" brought by a prisoner under the

PLRA is a "civil <u>or criminal</u> judicial proceeding," <u>Hashmi</u>, 2008 WL 216936 at *7 (emphasis

added) (quoting Black's Law Dictionary 28 (8th edition 2004)), then an "action" cannot be

limited, as <u>Ayala-Lopez</u> and <u>Hashmi</u> would have it, to those instances in which a prisoner

initiates a lawsuit. This is because a prisoner cannot initiate a criminal suit. <u>See</u>, <u>e.g.</u>, Fed. R. Cr.

Pr. 7(c)(1) (indicating that an indictment must be signed by an attorney for the Government).

Similarly, if an "action" brought by a prisoner includes a "civil <u>or criminal</u> judicial proceeding,"

<u>Hashmi</u>, 2008 WL 216936 at *7 (emphasis added), then an "action" must <u>include</u> motions filed

by the prisoner. It is only by filing motions that a defendant-prisoner in a criminal case can bring

forward claims.

In short, interpreting the PLRA as Kassir does, to equate "action" with the

initiation of a lawsuit, renders it all-but impossible for the PLRA's administrative exhaustion

requirement to have any practical impact in the criminal context. Such an interpretation is not

true to a dictionary-definition of "action." Rather, this approach runs afoul of it. It interprets

"action" in way that reads out of that word part of its meaning — "civil <u>or criminal</u> judicial

proceeding."

In terms of a plain language interpretation of the PLRA, the better approach is to

recognize that "civil or criminal judicial proceeding" is not a self-defining phrase, such that to

define this term — and, by inference, to define "action" in the PLRA — an authoritative

11

dictionary must be consulted.  Black's Law Dictionary defines "proceeding" as follows:

> 1. The regular and orderly progression of a lawsuit, including all acts and events between the time of commencement and the entry of judgment. 2. Any procedural means for seeking redress from a tribunal or agency. 3. An act or step that is part of a larger action.

Black's Law Dictionary (8th ed. 2004).  This definition makes it clear that a "proceeding" — and hence an "action" — includes all motions filed in the course of a litigation.  Accordingly, the PLRA applies to motions, such as the defendant has filed here.

   In addition, neither Hashmi nor Ayala-Lopez can be readily reconciled with the Second Circuit's decision in Nagy.  As noted above, in Nagy, the Second Circuit held that the PLRA applies "regardless of the type of pleading filed by the prisoner to obtain relief," so long as the prisoner's claims are "comparable" to the relief that would typically be sought in a § 1983 suit.  See Nagy, 85 F.3d at 117.  The Second Circuit's concern with substance over form is inconsistent with the focus in Hashmi and Ayala-Lopez on whether, as a formal mater, the prisoner's filing is styled as a motion (as opposed to a lawsuit-initiating complaint).[6]

   Moreover, Nagy cannot be distinguished by emphasizing that it is a case about whether the PLRA applies to the imposition of filing fees — but that Hashmi and Ayala-Lopez control when, as here, the question is whether administrative remedies must be exhausted.  This distinction is not persuasive for two reasons.

   First, if this distinction prevailed, the PLRA would be applied, without good

---

   [6] Regrettably, the Government failed to bring Nagy (or Antonelli) to Judge Preska's attention in Hashmi.  There is no indication that Judge Preska considered the impact of Nagy in interpreting the PLRA.

reason, in piecemeal fashion.  To a single conditions of confinement claim, the PLRA's filing fee requirement (designed to discourage unnecessary recourse to the courts) might apply, while the exhaustion requirement (designed for the same purpose) would not.  This does not make sense. See, e.g., Antonelli, 371 F.3d at 361 (where the PLRA applies, prisoner must both exhaust administrative remedies and comply with the PLRA's filing fees requirements).

Second, the Nagy Court based its decision on an interpretation of the phrase "civil action."  See Nagy, 85 F.3d at 116-17 (construing 28 U.S.C. § 1915(a)(2)).  Under Nagy, requests for relief that function like § 1983 suits are to be treated as PLRA-triggering "civil action[s]," regardless if, strictly speaking, they are or are not.  See id.  Nagy's interpretation of "civil action" in one section of the PLRA is directly relevant to the interpretation of "action" in other sections of the PLRA — including the section concerned with administrative exhaustion that is at issue here.  When Congress uses the same language in two different places in the same statute, the words are generally read to mean the same thing in both places.  See, e.g., Commissioner v. Lundy, 516 U.S. 235, 250 (1996).  This principle has special force when, as here, the different parts of the statute are meant to advance similar goals; Section 1915 of the PLRA (which the Nagy Court interpreted) and Section 1997 of the PLRA (which is at issue in this case) are both designed to deter the filing of prisoner lawsuits that are either frivolous or premature.  Cf. Lundy, 516 U.S. at 250 (noting that, among other things, "the interrelationship" of statutory provisions "presents a classic case for application of the normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning") (internal quotation marks, citation omitted).

Finally, the interpretation of the PLRA put forth in Hashmi and Ayala-Lopez —

13

and embraced here by Kassir — is at odds with the purposes of the statute.  In Hashmi, the Court

indicated that "Congress's clear purpose in enacting the PLRA, as the Supreme Court has

recognized, was to reduce the quantity of lawsuits related to prison conditions."  Hashmi, 2008

WL 216936 at *8.  If this were the sole purpose of the PLRA, it might make sense to

differentiate, as Hashmi and Ayala-Lopez do, between pleadings that initiate lawsuits and those,

such as motions, that do not.  But the Supreme Court has explained that the "PLRA's dominant

concern [is] to promote administrative redress, filter out groundless claims, and foster better

prepared litigation of claims aired in court."  Porter, 534 at 528 (emphasis added).  Each of these

goals would be advanced by requiring the exhaustion of all conditions of confinement claims —

even when they are raised in the course of a motion and hence do not, of themselves, lead to the

initiation of a new lawsuit.

   In sum, the SAMs Motion should be dismissed because the defendant was

required to exhaust administrative remedies before filing it and he did not do so, and Ayala-

Lopez and Hashmi are not persuasive authorities to the contrary.

## III. THE SAMs MOTION IS MERITLESS

   Should the Court determine to consider the SAMs Motion on the merits, the

Government respectfully submits that, for the reasons set out below, the SAMs Motion should be

denied.[7]

---

  [7]  As the Supreme Court has said: "the PLRA exhaustion requirement is not
jurisdictional, and thus allow[s] a district court to dismiss plainly meritless claims without first
addressing what may be a much more complex question, namely, whether the prisoner did in fact
properly exhaust available administrative remedies."  Woodford, 548 U.S. at 101.

Pursuant to the Supreme Court's decision in <u>Turner v. Safley</u>, 482 U.S. 78 (1987), a prison regulation that "burdens" federal constitutional rights is constitutional so long as it is "reasonably related to legitimate penological objectives." <u>Id.</u> at 87. These "legitimate penological objectives" include a concern with "institutional security." <u>See</u> <u>O'Lone v. Estate of Shabazz</u>, 482 U.S. 342, 348 (1987).

<u>Turner</u> is controlling here. The Supreme Court has explained that "<u>Turner</u> applies to all circumstances in which the needs of prison administration implicate constitutional rights," <u>Washington v. Harper</u>, 494 U.S. 210, 224 (1990), and the Court of Appeals has assessed a challenge to the constitutionality of particular SAMs under the "reasonably related" standard set forth in <u>Turner</u>. <u>See</u> <u>United States v. El-Hage</u>, 213 F.3d 74, 82 (2d Cir. 2000).

As set forth below, under <u>Turner</u>, the various claims advanced in the SAMs Motion are not persuasive.[8]

A.      The SAMs Do Not Violate Kassir's Right to Counsel

The defendant contends that the SAMs are "impermissibly interfering," with his right to counsel. Def. Memo at 7. As set forth below, however, this argument is not persuasive.

First, the defendant notes that the Government has produced a "vast amount of computerized materials" in discovery — and complains that he has "been unable to review certain of these materials due to the limitations of the equipment provided for his use." <u>Id.</u> But

---

[8] Challenges to SAMs may be assessed based on facts proffered to the Court. <u>See</u> <u>Hashmi</u>, 2008 WL 216936 at *8 (citing <u>El-Hage</u>). The factual information proffered in this section has been described directly to the undersigned by a supervisory MCC official and by an MCC attorney.

this complaint is inapposite.  The SAMs do not purport to restrict how the defendant reviews

discovery, or what "equipment," Def. Memo at 7, he may use to do so.  Accordingly, the

defendant's apparent dissatisfaction with the "equipment" he has been provided has nothing to

do with the SAMs, and accordingly does not have any bearing on whether the SAMs are

constitutional.

Moreover, it bears noting that with the exception of Kassir, every other prisoner at

the MCC who wishes to review electronic discovery must do so at a scheduled time, using

computers allocated by the MCC for shared usage by prisoners.  The only prisoner in the MCC

who has access to his own computer for discovery-review purposes is Kassir.  The Government

provided this computer to the MCC, to be used solely by Kassir for reviewing electronic

discovery — and MCC correctional officers assigned to Kassir's floor report that he routinely

spends up to four hours at a time sitting reviewing discovery materials on the computer.  Indeed,

the Government has recently received a request from the MCC for a new computer battery —

Kassir's discovery-review sessions have been so lengthy that a back-up battery is required.  In

these circumstances, Kassir's complaints about the "equipment" available to him ring especially

hollow.

Second, the defendant contends that "the nature of the visits prevent counsel and

Mr. Kassir from reviewing particular documents together."  Def. Memo. at 7.  It is true that the

defendant and his counsel are permitted only "non-contact meetings."  Id. at 3.  When they meet,

Kassir and his lawyers must sit across the table from one another, separated by a metallic screen.[9]

---

[9]  The people on both sides of the screen can see through it, and can speak to one another
without the need for an amplification device.

16

But this arrangement does not "prevent" documents from being simultaneously reviewed by the defendant and his counsel. Def. Memo at 7. Defense counsel has sent many boxes of documents to Kassir. Nothing prevents defense counsel from bringing a copy of a particular document to a "non-contact meeting[]" with Kassir, and asking Kassir to bring his copy of the document to the same meeting. This would permit the defendant and his attorneys simultaneously to review the document in question, each on their own side of the metallic screen. Similarly, during the course of any given "non-contact meeting[]," Kassir's attorneys are permitted to pass up to three inches of documents to Kassir, through an MCC officer.[10] This, too, permits Kassir's attorneys to review documents together, with defense counsel referring to his copy of a document and the defendant referring to the copy that has just been passed to him.

These arrangements simply do not "burden" the defendant's Sixth Amendment rights — and to the extent the requirement of "non-contact meetings" imposes any meaningful burden on document-sharing between the defendant and his counsel, this requirement is "reasonably related" to the MCC's legitimate objective of protecting institutional security. See Turner, 482 U.S. at 87, 96-97 (requiring that a restriction be "reasonably related" to legitimate penological objectives if it "burdens" a constitutional right). As set forth in the Supporting Memorandum, Kassir has said that he received jihad training in Afghanistan; that he supports Usama Bin Laden; and that he would kill a person (and bury that person's body in rural Oregon) for not having a sufficiently substantial jihad training operation in place when he (Kassir) arrived in the United States. See supra at Part I. Moreover, Kassir has been charged by a Grand Jury

---

[10] This amounts to about 1,400 pages of documents per visit.

17

with providing material support to al-Qaeda — and during 2000, a pre-trial MCC detainee, against whom a charge of providing material support to al-Qaeda is still pending, stabbed an MCC officer in the eye as part of a larger conspiracy to take hostages, including defense lawyers visiting clients in the prison. See United States v. Salim, 287 F. Supp.2d 250, 290-301 (S.D.N.Y. 2001). Given what is known about Kassir, and given the MCC's experience with other al-Qaeda-associated inmates, see id., it is reasonable to limit the physical contact between Kassir and his attorneys. This helps to insure the safety of Kassir's lawyers, as well as the safety of the MCC officers who would be called upon to assist in any altercation.

Next, the defendant contends that the SAMs violate his Sixth Amendment right to counsel because "the limitation on counsel's ability to rely on paralegals, investigators, and other staff to meet with the defendant, or to share information freely with them prevents counsel from having their staff or the investigator employed by the defense communicate as they see fit with experts or witnesses." Def. Memo at 7-8.

These claims are without merit. The SAMs explicitly allow paralegals to meet with the defendant. See Ex. B (Attorney General Memorandum and SAMs) at §2(e). Moreover, defense counsel is permitted to "share information freely," Def. Memo. at 8, provided that the purpose of doing so is "preparing the inmate's defense." Ex. B (Attorney General Memorandum and SAMs) at §2(e). It is not clear how limiting communications to the preparation of a defense burdens the right to do so.

It is true that under the SAMs an investigator may meet with the defendant only if defense counsel or a paralegal is present. See Ex. B (Attorney General Memorandum and

18

SAMs) at §2(e), (f). But the burden this restriction imposes, if any, on the defendant's Sixth Amendment rights is entirely de minimis. Especially in a case such as this one — in which the defendant has two defense counsel — it should be simple enough to arrange meetings between the investigator and the defendant at which one of the defense lawyers or a paralegal is present.

Moreover, even if the restriction on investigator meetings imposes a small burden on the defendant's Sixth Amendment rights, that burden is "reasonably related" to the goal of institutional security. The real-world consequences of breaching the SAMs can be grave. See United States v. Sattar, 395 F. Supp.2d 79, 85-88 (S.D.N.Y. 2005) (describing message to terrorists, conveyed in violation of SAMs, that a cease-fire should not be observed). Although attorneys have sometimes breached their obligations under the SAMs, see id., it is nonetheless reasonable to conclude that an officer of the court will take his SAMs obligations especially seriously — and will impress upon others the importance of adhering to the SAMs, including upon any investigator with whom the attorney is visiting the defendant.

Finally, Kassir contends that the SAMs violate his Sixth Amendment right to counsel because they require him to "disclose [his] defense to the government before trial." Def. Memo at 8. The basis for this argument is that, under the SAMs, a certain sub-class of materials must be pre-cleared by the United States Attorney's Office before they are provided by defense counsel to the defendant. See id. This sub-class of materials includes "inflammatory materials, . . . military training manuals, or materials that may be used to pass messages from inmate to inmate." See Exhibit B (Attorney General Memorandum and SAMs) at §2(h)(i)-(ii). Given Kassir's background and the charges against him, see supra, there can be little doubt that these restrictions are reasonably related to a concern for institutional security. See generally Turner,

482 U.S. at 87.  A self-described follower of Usama Bin Laden, who says he has received jihad training, cannot expect unfettered access to, for example, "military training manuals."

Moreover, the defendant's claim with respect to the SAMs' pre-clearance requirement is premature.  BOP officials have discretion with respect to how they implement any particular SAMs restriction, see supra n.3, and no request for pre-clearance of any materials has been made to the U.S. Attorney's Office.  If a pre-clearance request is ultimately made, the Government will work with defense counsel toward a resolution of any such request that balances the defendant's Sixth Amendment rights with the MCC's need to maintain a safe environment.  See June 2, 2008 Order (directing counsel to "confer and attempt to resolve any issues of an administrative or similar nature before addressing them to the Court"); cf. May 29, 2008 Government Letter to the Court at 1, n.1 (noting that, with respect to certain SAMs issues, the Government has employed a "wall agent").  It makes little sense for the defendant to complain about deficiencies in a pre-clearance mechanism that he has not even attempted to use.

B.    The SAMs Have A Sufficient Factual Basis

The defendant also contends that the SAMs are "not tailored uniquely" to him and that "is enough to invalidate them." Def. Memo at 6.  But no cases are cited in support of this proposition, and the Government has not found any.  This is not surprising.  Under Turner, SAMs are unconstitutional to the extent that they are not "reasonably related" to legitimate penological interests, see supra — not to the extent they meet Kassir's hypothesized "tailored uniquely" standard.

Moreover, it is clear that the SAMs were imposed based on facts that are

20

"unique[]" to Kassir — the Supporting Memorandum and the Attorney General Memorandum

describe actions that Kassir has himself undertaken. See supra. The defendant does not contest

this; rather, he argues that the SAMs were imposed in an "automatic[]" way, Def. Memo at 7,

because, on the defendant's information and belief, a number of people accused of being

associated with al-Qaeda have been subjected to SAMs similar to those at issue here. See Def.

Memo at 6 (referring to SAMs imposed on Ahmed Ressam and Zacarias Moussaoui). But even

if true, this proves too little. Kassir has been charged with providing material support to al-

Qaeda, and the evidence against Ressam and Moussaoui suggested that they were associated with

al-Qaeda as well. Treating like cases alike, with respect to SAMs or in any other context, is the

hallmark of particularized, fact-specific decision-making — not of the sort of reflexive,

"automatic" determination that the defendant suggests the Acting Attorney General made here.

     C.    Kassir's Disciplinary History Is Immaterial To the Constitutionality of the SAMs

Kassir also states that "[h]e has been twice punished for alleged violations" of the

SAMs, and asserts that the "alleged violations, if proved, are de minimus." Def. Memo at 10.

But this is irrelevant. That Kassir has been punished for violating the SAMs does not suggest

anything about whether the SAMs are unconstitutional.

Furthermore, it bears noting that Kassir's description of his two violations is

inaccurate in a number of ways. The first of the referenced violations was for lying to prison

officials, not for violating the SAMs; and the two violations in questions are not "allegations" —

they have been proved.[11]

---

[11] Kassir was found guilty of lying to prison officials on December 13, 2007. Pursuant to
BOP regulations, the hearing was conducted by two hearing officers, following the preparation of

More importantly, the referenced violations can not be characterized as "de minimus." Def. Memo at 10. As to the first violation, Kassir lied to an MCC officer about what was in his cell. For the safety of themselves and all inmates, officers must be able to expect honest answers from prisoners as to what they are keeping in their cells. As to the second violation, Kassir was disciplined for speaking in what sounded like Arabic to a fellow inmate, Mohammed Mansour Jabarah. Jabarah pleaded guilty during 2002 to multiple al-Qaeda conspiracies, which targeted for attack, among other things, the United States embassies in Singapore and the Philippines; he was sentenced early this year to life in prison by Judge Jones. As set forth in the Sentencing Memorandum filed by the Government in that case, an impromptu search of Jabarah's quarters, during a period when he appeared to be cooperating with the Government, revealed, "hidden steak knives and rope; directions on making explosives; . . . and handwritten materials bearing the initials of agents and prosecutors with whom Jabarah met, the context of which strongly suggested that they were being targeted for murder." It is not possible to know with certainty what Kassir and Jabarah said to one another at the MCC — as noted, they spoke in Arabic. But given their respective backgrounds, there is nothing "de minimus" about Kassir breaching the SAMs to speak with Jabarah.

D.      The Defendant's Miscellaneous Claims Are Meritless

Finally, the defendant presses a series of miscellaneous complaints about the

---

a written accusation that was made available to Kassir before the hearing. At the hearing, Kassir had both the right to be present and the right to address the tribunal. Kassir appealed from the December 13th decision, and that appeal was denied on the merits on January 2, 2008. Kassir did not pursue further appeals — two were available. As to the second violation, for breaching the SAMs, Kassir was found guilty on April 18, 2008. Kassir took an appeal, which was dismissed as untimely on May 20, 2008. Again, Kassir did not pursue further appeals.

conditions of his confinement.  First, Kassir argues that a number of the SAMs restrictions "do

not appear to enhance" institutional security — such that these restrictions are necessarily

"unduly punitive" and cannot be justified.  Def. Memo. at 9-10.  For example, the defendant

notes that he has been receiving edited newspapers, and says that "it is difficult to imagine" the

harm that could come from permitting him to receive un-edited newspapers.  Def. Memo at 10.

But this policy makes sense.  MCC officers have been directed to excise classified

advertisements and letters to the editor from newspapers provided to the defendant — because

they may contain messages designed to reach Kassir.  A classified advertisement, for example, is

inexpensive to buy and, though it appears innocuous, may contain coded messages.  In addition,

Kassir's legitimate interest in these particular parts of the newspaper is quite low.[12]

   To cite another example, the defendant notes that he has been permitted to

purchase only certain food items from the MCC commissary.  See Def. Memo at 10 ("It is

difficult to imagine what harm may flow from allowing [Kassir] to purchase the range of food

items available to the other MCC inmates in order to supplement his diet.").

   But Kassir's commissary limitation does not suggest that the SAMs are

constitutionally infirm because the limitation has noting to do with the SAMs.  Kassir is

permitted to purchase the same commissary food items as every other inmate in the MCC's

---

  [12]  There is a suggestion in the SAMs Motion that additional parts of the newspaper are
being excised.  See Def. Memo at 4.  In response to this suggestion, on June 4, 2008 a
supervisory official at the MCC told the undersigned that he would personally reiterate to the
responsible MCC officers that only letters to the editor and classified advertisements should be
removed from the defendant's newspaper.  Similarly, during June of 2008 the undersigned told
the "wall agent," see supra, who has participated in the newspaper-screening process, that only
letters to the editor and classified advertisements should be removed.

"Special Housing Unit" located on the south wing of the tenth floor — whether or not those inmates are themselves subject to SAMs.[13]

Moreover, the limitations on the defendant's commissary purchases are in no way onerous. See May 22, 2008 Government Letter to the Court at 2 (noting that, as of May 22, 2008, records maintained by the MCC reflect that Kassir had spent $538.60 on commissary items during 2008, and that food purchases made by Kassir from the commissary have included granola, canned fish, name-brand candy bars, honey, and peanut butter).

Finally, even to the extent that commissary limitations on Kassir impose a "burden" on him, there is no constitutional violation. See Turner, 482 U.S. at 87, 96-97 (requiring that a restriction be "reasonably related" to legitimate penological objectives if it "burdens" a constitutional right). The MCC's predominant purpose in limiting the commissary items available to "Special Housing Unit" prisoners is to insure that available food stuffs cannot be readily used as weapons by prisoners. For example, Special Housing Unit inmates may not buy aluminum cans of soda because, twisted apart, the metal inside of these cans can be quite sharp. Cf., e.g., Salim, 287 F. Supp.2d at 290-301 (noting that as part of 2000 attack inside the Special Housing Unit, al-Qaeda-associated prisoners splashed hot pepper sauce in an MCC correctional officer's eyes).

Kassir also complains that his attorney is not permitted to disseminate information to third parties. See Def. Memo at 9. This is improper, the defendant argues, because "Mr. Kassir's case is a matter of legitimate interest, particularly in the Country of Sweden, where he

---

[13] Kassir was first placed in the Special Housing Unit on September 25, 2007, immediately upon arriving at the MCC and more than a month before the SAMs were imposed.

24

resides, and has been much covered by the media there.  It is important that the public know

about the nature of the charges against him, his well-being, and the conditions of his

confinement." Def. Memo at 9.  It is true, of course, that the SAMs prevent defense counsel

from relaying the content of defendant's conversations to third parties.  See Ex. B (Attorney

General Memorandum and SAMs) at §2(d).  But there is nothing in the SAMs that prohibits

defense counsel from describing for the public the "nature of the charges," Def. Memo at 7,

against Kassir — as the Indictment has done, and as any trial will do.  And it should be possible

for defense counsel to describe the defendant's "well-being and the conditions of his

confinement," id. — as the SAMs Motion has already purported to do — without trenching on

the SAMs.

IV.    CONCLUSION

             The SAMs Motion should be denied because the defendant has failed to exhaust

administrative remedies, as required by the PLRA.  Should the Court consider the SAMs Motion

on the merits, it should be denied.

Dated:  New York, New York
        June 19, 2008

                                    Respectfully Submitted,
                                    MICHAEL J. GARCIA
                                    United States Attorney

                            By: _____
                                    Michael Farbiarz
                                    Assistant United States Attorney
                                    Tel. No.: (212) 637-1587

## CERTIFICATE OF SERVICE

MICHAEL FARBIARZ, pursuant to Title 28, United States Code, Section 1746, hereby declares under the penalty of perjury that a true and correct copy of the foregoing was served via overnight courier on the below-listed date on:

Edgardo Ramos, Esq.
Day Pitney
7 Times Square
New York, NY 10036

and

Mark S. DeMarco
Attorney at Law
2027 Williamsbridge Road
Bronx, NY 10461

Dated: New York, New York
June 19, 2008

_____
Michael Farbiarz
Assistant United States Attorney
Tel. No.: (212) 637-1587