**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

UNITED STATES OF AMERICA          :

    - v. -                                      :

                                 **S2 04 Cr. 356 (JFK)**

**OUSSAMA ABDULLAH KASSIR,**          :
   a/k/a "Abu Abdullah,"
   a/k/a "Abu Khadija,"                        :

          **Defendant.**          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - -  x


## GOVERNMENT'S MEMORANDUM OF LAW IN RESPONSE TO THE DEFENDANT'S OMNIBUS MOTION


                                   **MICHAEL J. GARCIA**
                                   **United States Attorney**
                                 **Southern District of New York**
                                 **Attorney for the United States of America**


**Michael Farbiarz**
**Assistant United States Attorney,**
   **Of Counsel.**

## Table of Contents

I.    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   The Motion To Preclude In-Court Witness Identification Of The Defendant Should Be
      Denied Without A Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.  The Defendant Has Withdrawn His Request For Relief Under Rule 12(d)(2) . . . . . . . . 18

IV.   The Government Consents To The Defendant's Reservation of Rights
      With Respect To A  Jencks Act Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

V.    The Defendant's 404(b) Motion Should Be Denied As Premature . . . . . . . . . . . . . . . . . 19

VI.   The Defendant's Roviaro Motion Should Be Denied As Moot . . . . . . . . . . . . . . . . . . . . 19

VII.  The Government Will Provide The Requisite
      "Reasonable Notice" Under Rule 404(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

VIII. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - -     x

UNITED STATES OF AMERICA                  :

   - v. -                                              :

                                                **S2 04 Cr. 356 (JFK)**

OUSSAMA ABDULLAH KASSIR,                   :
   a/k/a "Abu Abdullah,"
   a/k/a "Abu Khadija,"                        :

             **Defendant.**                          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - -     x

### GOVERNMENT'S MEMORANDUM OF LAW IN RESPONSE TO THE DEFENDANT'S OMNIBUS MOTION

      The Government respectfully submits this Memorandum of Law in response to the Omnibus Motion ("Omnibus Motion"), filed on May 19, 2008 by the defendant, Oussama Abdullah Kassir a/k/a "Abu Abdullah," a/k/a "Abu Khadija" ("Kassir" or "the defendant"), and accompanied by a Memorandum of Law ("Def. Memo").

      The Omnibus Motion principally seeks to preclude certain witnesses from identifying the defendant at trial, because of the use of assertedly suggestive out-of-court identification procedures. This request should be denied without a hearing. The jury is capable of assessing the credibility of in-court identification testimony, and the witnesses who identified Kassir out of court are closely familiar with him. See infra Part II.

      The Omnibus Motion also seeks relief with respect to five other matters. With one exception, see infra Part IV, these requests should be denied. See infra Parts III, V-VII.

### I.    Background

      On February 6, 2006, a superseding Indictment ("Indictment") was filed that charged Kassir, as well as two co-conspirators, Mustafa Kamel Mustafa, a/k/a "Abu Hamza,"

1

a/k/a "Abu Hamza Al-Masri," a/k/a "Mustafa Kamel," a/k/a "Mostafa Kamel Mostafa" ("Abu

Hamza"), and Haroon Rashid Aswat, a/k/a "Haroon," a/k/a "Haroon Aswat" ("Aswat").  See

Exhibit A (Indictment).  The Indictment is in 19 counts and concerns four courses of criminal

conduct: a hostage-taking conspiracy, in which Abu Hamza is charged (Counts One and Two); a

conspiracy to establish a Jihad training camp in the United States, in which Kassir, Abu Hamza,

and Aswat are charged (Counts Three through Eight); the establishment of terrorist websites, as

to which Kassir is charged (Counts Nine through Fourteen); and a conspiracy to facilitate violent

Jihad in Afghanistan (Counts Fifteen through Nineteen).  See id.

In support of these allegations, the Government will seek to prove at trial, among

others, the following facts.

Abu Hamza was a cleric at a mosque in London, widely known in the United

Kingdom for the Jihadi sermons that he delivered.  During the fall of 1999, Abu Hamza and a

United States citizen ("CC-1")[1] agreed that Abu Hamza would send two "brothers" from the

United Kingdom to the United States to assist in the creation here of a Jihad training camp.

These "brothers" were Kassir and Aswat.  See Exhibit A (Indictment) ¶¶ 5-14.

On or about November 28, 1999, Kassir and Aswat arrived at John F. Kennedy

International Airport in New York City.  Kassir and Aswat then traveled to Seattle, Washington,

where they met CC-1, and spent approximately three-and-a-half-months in the Pacific Northwest.

While in the Pacific Northwest, Kassir and Aswat lived in a radical Seattle mosque ("Seattle

Mosque" or "the Mosque").  See id.

At the Seattle Mosque, Kassir offered instruction to small groups of men on

certain practical aspects of violent Jihad.  Kassir showed the men how to build and use a firearm

---

[1] CC-1 is referred to in the S2 Indictment as CC-2.

-2-

silencer, for example, and how to conduct effective nighttime surveillance of a moving target. In addition, Kassir and Aswat traveled with CC-1 to a farm complex in Bly, Oregon, a remote town that was the proposed location of the above-referenced Jihad training camp. At Bly, Kassir continued to provide guidance to Mosque associates with respect to the nuts-and-bolts of Jihad. For example, Kassir provided instruction on how to kill a man by slitting his throat, and disseminated information from an electronic version of the "Encyclopedia of Jihad."[2]  See id.

While in the United States, Kassir complained bitterly that the Bly, Oregon operation was not as substantial as he had been lead to believe. For example, Kassir stated that Bly lacked sufficient men and weapons — and, frustrated by this fact, Kassir said that he would kill CC-1 and dispose of CC-1's body in Bly. After three-and-a-half months in the Pacific Northwest, Kassir and Aswat left the United States. See id.

After leaving the United States, Kassir worked to establish and then to maintain a number of websites. These websites were used to disseminate terrorist materials — including highly graphic videos showing Jihadis participating in murder and torture, and instructions on how to make bombs and poisons. See id. ¶¶ 15-26.

On September 25, 2007, the defendant was brought to the United States from the Czech Republic, following an extradition proceeding. Kassir was arraigned on September 25th and pleaded not guilty.

## II.     The Motion To Preclude In-Court Witness Identification Of The Defendant Should Be Denied Without A Hearing

By letter dated February 26, 2008, the Government informed the defendant that

---

[2]  The "Encyclopedia of Jihad" is a multi-volume Islamist handbook that provides practical information on, among other things, how to conduct sabotage operations; how to prepare explosives; how to mix poisons; and how to ambush and kill people.

photographs were shown to eleven witnesses by law-enforcement agents at various points during the period from 2002 to 2005 — and that ten of the witnesses correctly recognized a photograph of Kassir. See Exhibit B (Discovery Letter) at 1-3. In the Omnibus Motion, the defendant seeks an order precluding these ten witnesses from identifying him at trial ("Preclusion Motion") and, in the alternative, seeks a Wade hearing, see United States v. Wade, 388 U.S. 218 (1967), with respect to the witnesses' pre-trial identifications of Kassir. See Def. Memo at 1-3. As set forth below, both the Preclusion Motion and the defendant's request for a hearing should be denied.[3]

A witness may identify a defendant at trial, after previously identifying the defendant out-of-court — unless "under all the circumstances of th[e] case there is a very substantial likelihood of irreparable misidentification." Manson v. Brathwaite, 432 U.S. 98, 116 (1977) (internal quotation marks omitted). Under this standard, a trial witness may identify the defendant if: (1) the out-of-court identification procedure was not improperly suggestive; or (2) the in-court identification will be grounded on "an independent basis in memory," United States v. Bubar, 567 F.2d 192, 197 (2d Cir. 1977), and not solely on the impression made on the witness by his out-of-court identification of the defendant. See United States v. Kwong, 69 F.3d 663, 666 (2d Cir. 1995).[4]

The Supreme Court has held that "reliability is the linchpin in determining the

_____

[3] The ten witnesses who recognized the defendant are denominated in the Government's February 25, 2008 discovery letter as W-1 through W-8 and W-10 through W-11. W-9 did not recognize the defendant. See Exhibit B (Discovery Letter) at 1-3. Of the ten witnesses who identified Kassir, one is a law-enforcement officer ("Law-Enforcement Witness"); the remaining nine witnesses are referred to hereinafter, collectively, as "Identifying Witnesses" or "Witnesses."

[4] The second prong of this inquiry is sometimes described as an assessment of "whether an in-court identification will be the product of the suggestive procedures or whether instead it is independently reliable." United States v. Tortora, 30 F.3d 334, 338 (2d Cir. 1994).

-4-

admissibility of identification testimony," Manson, 432 U.S. at 114, and it is generally for juries

to determine whether any particular witness is testifying in reliable fashion. It follows that the

standard for judicial preclusion of an in-court identification is high ("a very substantial likelihood

of irreparable misidentification," id.) — and that, concomitantly, concerns with respect to the

reliability of an out-of-court identification are typically left "for the jury to weigh." Id. at 116.

As the Supreme Court has explained:

> We are content to rely upon the good sense and judgment of American juries, for
> evidence with some element of untrustworthiness is customary grist for the jury
> mill. Juries are not so susceptible that they cannot measure intelligently the weight
> of identification testimony that has some questionable feature.

Id.

Similarly:

> Where identification evidence is at issue . . . no . . . special considerations justify
> a departure from the presumption that juries will follow instructions. It is the
> reliability of identification evidence that primarily determines its admissibility[.]
> And the proper evaluation of evidence under the instructions of the trial judge is
> the very task our system must assume juries can perform.

Watkins v. Sowders, 449 U.S. 341, 347 (1981) (citations omitted).[5]

In keeping with the principles set forth above, a hearing is not required on all

motions to preclude in-court identification, see Watkins, 449 U.S. at 349, and courts routinely

deny such motions without a hearing — leaving it for the jury to determine whether a witness's

in-court identification of the defendant is or is not reliable. Thus, for example, in United States

---

[5] Accord, e.g., Manson, 432 U.S. at 113 n.14 (quoting with approval a concurring opinion of
Judge Leventhal: "'While identification testimony is significant evidence, such testimony is still
only evidence, . . . Counsel can both cross-examine the identification witnesses and argue in
summation as to factors causing doubts as to the accuracy of the identification including
reference to . . . any suggestibility in the identification procedure'"); Dunnigan v. Keane, 137
F.3d 117, 129 (2d Cir. 1998) ("Even if the only duty of [the] jury in the case is to assess the
reliability of th[e identification] evidence, the information needed for assessment of reliability
can ordinarily be elicited through the time-honored process of cross-examination") (internal
citations and quotation marks omitted, brackets and underlining in Dunnigan).

v. Ruggiero, 824 F. Supp. 379, 396 (S.D.N.Y. 1993), aff'd sub nom. United States v. Aulicino,

44 F.3d 1102 (2nd Cir. 1995), Judge Conboy denied, without a Wade hearing, the defendant's

motion to preclude an in-court identification of the defendant:

> Even assuming that [the out-of-court identifications were
> conducted in an improperly suggestive manner], a pretrial
> determination is neither necessary nor appropriate in this case. A
> pretrial hearing . . . is not appropriate because the defendants'
> concerns can be satisfied at trial. The Supreme Court has
> concluded that a court is not required to conduct an evidentiary
> hearing outside the jury's presence. . . . Because determinations of
> reliability are traditionally put to the jury, the Supreme Court has
> held that conducting such a hearing in the jury's presence is
> constitutionally permissible. Defendants' due process rights and
> the reliability of the identification evidence can be ensured through
> the "time-honored process of cross-examination" -- "the device
> best suited to determine the trustworthiness of testimonial
> evidence."

Ruggiero, 824 F. Supp. at 396 (quoting Watkins, 449 U.S. at 348-49); see also, e.g., United

States v. McClean, 89 Cr. 348 (JFK), 1989 WL 79450, at *1 (S.D.N.Y. July 10, 1989) (Keenan,

J.) (denying motion to suppress identification and for a Wade hearing, on the ground that

"Manson v. Braithwaite, 432 U.S. 98, 115 (1977) teaches that there is no need to conduct an

evidentiary hearing on the identification procedures utilized"); United States v. Song, 95 Cr. 129

(KMW), 1995 WL 736872, at *6 (S.D.N.Y. Dec. 13, 1995) (Wood, J.) ("There is also no need

for a hearing on the constitutionality of the procedures utilized in showing a photo array to

prospective witnesses in the course of the government's investigation of this case. Defendants

have made no showing that the procedures used in showing the array to any witnesses were

unduly suggestive, and any questions concerning the reliability of witnesses' identifications can

be properly raised on cross-examination."); cf. United States v. Greo, 85 Cr. 961 (JFK), 1994

WL 202605 at *2 (S.D.N.Y. May 23, 1994) (Keenan, J.) (denying defendant's motion to preclude

-6-

in-court identification, and noting that "a defendant is not entitled to an automatic pretrial hearing regarding the admissibility of all eyewitness identification testimony").

In this case, the Preclusion Motion should be denied without a Wade hearing. This is so for three reasons.

First, the concerns raised by the defendant about assertedly suggestive out-of-court identifications, see Def. Memo at 1-3, can be fully explored at trial. Through the "time-honored process of cross-examination," Watkins, 449 U.S. at 349, and by presenting "argu[ments] in summation," Manson, 432 U.S. at 113 n.14 (internal quotation marks omitted), defense counsel can advance the claim that in-court identifications of Kassir are merely the product of suggestive out-of-court identifications. Weighing this claim requires a common-sense judgment as to whether the witness making the in-court identification is reliable and credible, id., and the making of such judgments is "the very task our system must assume juries can perform." Watkins, 449 U.S. at 347; Manson, 432 U.S. at 113 & n.14. In this case, there is no reason to take this task away from the jury, as granting the Preclusion Motion would.

Second, the Preclusion Motion should be denied without a Wade hearing because identifications of Kassir by the Identifying Witnesses, see supra n.3, simply do not implicate the concerns that animate Wade and its progeny. The Supreme Court has explained that the "driving force" behind Wade and its companion cases "was the Court's concern with the problems of eyewitness identification. Usually the witness must testify about an encounter with a total stranger under circumstances of emergency or emotional stress. The witness' recollection of the stranger can be distorted easily by the circumstances or by later actions of the police." Manson, 432 U.S. at 111-12; Wade, 388 U.S. at 230 (quoting then-Professor Frankfurter: "The identification of strangers is proverbially untrustworthy") (citation omitted); see also, e.g.,

-7-

Vasquez v. Poole, 331 F.Supp.2d 145, 151 (E.D.N.Y. 2004) (noting that the leading Supreme
Court cases in this area "'developed out of concerns that eyewitness identifications (by strangers)
are not reliable'") (citation omitted); cf. Jackson v. Fogg, 589 F.2d 108, 112 (2d Cir. 1978)
("convictions based solely on testimony that identified a defendant previously unknown to the
witness [are] highly suspect") .

But in identifying Kassir, the Identifying Witnesses were not identifying a man
who was, to them, a "total stranger," encountered under "circumstances of emergency or
emotional stress." Manson, 432 U.S. at 111-12. The Identifying Witnesses are not tellers asked
to identify a bank robber or a victim asked to identify a rapist. See generally, e.g., Wade, 388
U.S. at 230 ("[l]ineups are prevalent in rape and robbery prosecutions"). Rather, the Identifying
Witnesses knew Kassir well — as someone they were introduced to, spoke with, lived with,
traveled with, or were trained by.

That is clear from the information set forth in the immediately succeeding sub-
paragraphs, which reflects partial summaries of some of the statements made by each Identifying
Witnesses to law-enforcement agents with respect to the Witness's experiences with Kassir.[6]

- W-1 spoke with Abu Hamza during 1999 about establishing a Jihad
  training camp in the United States, and W-1 sent Abu Hamza a facsimile
  with respect to the proposed camp. Hamza agreed to send two emissaries
  to the United States to explore the possibility of establishing such a
  training camp — and, soon thereafter, Kassir and Aswat arrived in Seattle.
  Kassir had with him a copy of the facsimile that W-1 had sent to Abu
  Hamza with respect to the Jihad training camp proposal, and Kassir

---

[6] The referenced statements are memorialized in Federal Bureau of Investigation FD-302s. The
302s have not been turned over in discovery. Compare Rule 16(a)(2) (indicating that Rule 16
does not require production of statements made by prospective Government witnesses, except to
the extent required by 18 U.S.C. § 3500) with 18 U.S.C. § 3500(b) (prior statements of a
Government witness must be turned over after the witness has testified). Should the Court wish
to review the relevant 302s, the Government will promptly make them available in camera and
ex parte.

showed it to W-1. During the approximately three-and-a-half months that Kassir remained in the United States, Kassir lived in the Seattle Mosque, and W-1 worshiped there. W-1, Kassir, and Aswat drove together to the location of the proposed training camp, a remote farm complex in rural Bly, Oregon. W-1, Kassir, and Aswat stayed together overnight at Bly. W-1 and Kassir argued repeatedly with respect to how and under whose direction the Bly camp would operate — W-1 believed that W-1 should be in charge of the camp, and Kassir believed that Kassir should be in charge.

- W-2 was living at the proposed Bly, Oregon Jihad training camp when W-1, Kassir, and Aswat arrived. W-2 watched Kassir give a number of compact disks to another person. Kassir said that one of the compact disks had the "Encyclopedia [of] Jihad" on it, and that the Encyclopedia would be of assistance with respect to training. W-2 later reviewed the compact disks that Kassir had handed over; between them, the disks contained, among other things, information on how to build bombs and make poisons, and audio clips of Abu Hamza. W-2 also described an argument that took place at Bly between Kassir and W-1 — in which Kassir complained that there were not enough guns at the Bly compound and referred to a facsimile that, according to Kassir, W-1 had sent to Abu Hamza.

- W-3 knew Kassir from the Seattle Mosque. Kassir told W-3 that he (Kassir) was in Seattle on vacation. Kassir also told W-3 that he (Kassir) had fought in Jihad in Kashmir, and showed W-3 photographs of Russian-made weapons that he (Kassir) stored on his computer. Kassir had a reputation for shoplifting, and on multiple occasions W-3 drove Kassir to various stores so that Kassir could get out of W-3's vehicle and rob them.

- W-4 worked at a store located two or three doors from the Seattle Mosque during the period when Kassir and Aswat were living there. W-4 was privy to complaints from various members of the Seattle Mosque with respect to inter-ethnic tensions at the Mosque. W-4 knew that Somali associates of the Mosque were frustrated by the fact that transient strangers were occasionally permitted to stay at the Seattle Mosque. W-4 recognized Kassir and Aswat as two transients who lived at the Mosque for a period of time.

- W-5 met Kassir and Aswat at W-1's apartment in Washington State. W-5 stated that Kassir's wife and two children stayed at W-1's apartment while W-1, Kassir, Aswat, and W-5 drove to Bly together and then stayed overnight there. A few weeks after returning from Bly, W-5 stated that he was present at the Seattle Mosque when W-1 loudly denounced Kassir.

- W-6 was an associate of the Seattle Mosque. During 1999, firearms were acquired by Mosque associates and W-6 went on a trip to a farm located in

-9-

southern Oregon, having been told by another Seattle Mosque associate that Mosque associates would train at the farm for Jihad. W-6 recognized Kassir from the Seattle Mosque, as well as from various social events during the relevant period. W-6 further recalled that Kassir's wife was not American.

- W-8 lived at the Seattle Mosque during 1999. "Al Khadijah"[7] arrived from London in late 1999 and lived at the Mosque. "Al Khadijah" told W-8 that he was from London, had served as a personal bodyguard for Usama Bin Laden, and had participated in Jihad in Bosnia. "Al Khadijah" spoke of forming a training camp in Bly, Oregon and went there on at least one occasion. "Al Khadijah" ultimately left the Mosque at around the same time as Aswat, having had a falling out with W-1.

- W-10 lived at the Seattle Mosque during 1999, where he met "Abu Khadijah."[8] "Abu Khadijah" told W-10 that he ("Abu Khadijah") had fought in Afghanistan, and that he was a member of al-Qaeda and a supporter of Usama Bin Laden. "Abu Khadijah" generally carried a .22 caliber gun, and told W-10 how to make an explosives device, a skill which "Abu Khadijah" said he had acquired in Afghanistan. "Abu Khadijah" showed W-10 a Swedish passport,[9] and indicated that he ("Abu Khadijah") had killed a number of people — and that, after his first killing, he had grown used to doing so. W-10 was in a Seattle-area gun store with "Abu Khadijah" when "Abu Khadijah" stole a long-barrel rifle by stashing it within his coat. "Abu Khadijah" stated that members of the Seattle Mosque should go to the mountains to engage in Jihad training sessions, including firearms training. W-10 attended more than 15 jihad training while W-10 resided at the Mosque — at these training sessions, "Abu Khadijah" demonstrated, among other things, how to cut a man's throat from behind, how to fire a weapon from various positions, and how to make a silencer for a firearm.

- W-11 was living on a farm in Bly, Oregon during November 1999 when two men arrived from London. One of the men was named "Haroun," and one was a Swedish citizen of Lebanese birth. The men said they had been sent by a mujahedin veteran from London, who was missing both hands and an eye;[10] the men brought with them a compact disk that contained information on making poisons. The Lebanese man said that he was a hit

---

[7] Kassir is commonly known as "Abu Khadija." See Exhibit A (Indictment) at 1.

[8] See supra n.7.

[9] Kassir is a Swedish citizen of Lebanese descent.

[10] Abu Hamza is missing both hands and one eye.

man for Usama Bin Laden, and showed W-11 a facsimile transmission that he said had been taken from Abu Hamza's office in London. W-11 saw the facsimile; it referenced, among other things, guns, bunkers, and hidden ammunition. The visitors from London stayed for many nights at Bly. During that period, a great deal of shooting could be heard, sometimes for periods of up to two hours. In addition, the Lebanese man sought to impose military-style discipline at the Bly farm, establishing perimeter patrols, and requiring those coming or going to give a password.[11]

In light of the information set forth above, it is readily apparent that there is a vast gulf between the sustained and substantive way the Identifying Witnesses knew Kassir, see supra — and the fleeting way that identification witnesses typically encounter defendants who are "total stranger[s]" to them. Manson, 432 U.S. at 111-12. Wade and its progeny are designed to place limits on this latter class of witness identifications — limits on identifications of defendants who are "total stranger[s]," id., not on identifications of defendants who are as well known to the Identifying Witnesses as Kassir is here.

Put differently, witnesses to certain sorts of crimes, such as robberies and rapes, see Wade, 388 U.S. at 230, may well be "handicapped in accurately estimating [physical] characteristics . . . by their very limited opportunity to observe and their lack of prior knowledge of the criminal." Levine & Tapp, The Psychology of Criminal Identification, 121 U. Penn. L. Rev. 1079, 1097 (1973). But these concerns do not meaningfully apply here. The Identifying Witnesses had "knowledge" of Kassir as a man they had met, and they had abundant opportunity to observe Kassir as he committed his crimes in the United States over the course of a three-and-a-half month period. See supra (noting that various Identifying Witnesses saw Kassir going to Bly and displaying a facsimile from Abu Hamza).

In short, there is a fundamental mismatch between the concerns that animate

---

[11] W-9, who did not identify a photograph of Kassir, is not treated above. W-7, the Law-Enforcement Witness, is considered below. See infra n.16.

Wade and its progeny and a case such as this one. This point has been well made by the Sixth

Circuit, in rejecting an argument that an attorney was ineffective for failing vigorously to cross-

examine a particular witness who provided identification testimony.

> The primary concern expressed in cases discussing the problems with eyewitness
> identification relates to a witness observing and subsequently identifying a
> stranger. The present case does not present such a situation. Purdie, the witness
> who testified that she observed Moss shoot Manley, saw him on a daily basis in
> the neighborhood. This case is simply not the 'stranger who jumps out of the
> dimly lit alley' situation that would raise reasonable doubts about Purdie's
> perception.

Moss v. Hofbauer, 286 F.3d 851, 862 (6th Cir. 2002) (citations omitted, emphasis in the original).

This conclusion — that the concerns of Wade and its progeny are far removed

from cases such as this one — is driven home by various Supreme Court and Second Circuit that

hold that when an out-of-court identification is improperly suggestive, even a short interaction

between the witness and the defendant is enough to permit the witness to make an in-court

identification of the defendant. See Manson, 432 U.S. at 114 (witness identification sufficiently

reliable when witness, an undercover police officer, saw the defendant, a drug-dealer for two to

three minutes); Raheem v. Kelly, 257 F.3d 122, 138 (2d Cir. 2001) (witnesses' opportunity to

observe the defendant was "good in terms of the duration of the overall encounter" when

witnesses, patrons in a bar drinking alcohol and watching television, glanced at a man in the bar

over the course of approximately 15 minutes before the man shot the owner); United States v.

Salameh, 152 F.3d 88, 126-27 (2d Cir. 1998) (witness identification sufficiently reliable when

witness, a gasoline station attendant, saw defendants and spoke with them as he pumped gas for

their car); Kwong, 69 F.3d at 666 (witness identification sufficiently reliable when witness, a

postal worker, saw defendant, who was mailing a package, for "four to five minutes"); United

States v. Leonardi, 623 F.2d 746, 755 (2d Cir. 1980) (witness identification sufficiently reliable

-12-

when witness, a motorist in a car, saw defendant, a fleeing robber, for 20-25 seconds — and noting "[t]hat amount of time has been held more than sufficient to render an identification dependable") (collecting cases); United States v. Sanchez, 603 F.3d 381, 385 (2d Cir. 1979) (witness identification sufficiently reliable when witness, an undercover police officer, spoke with the defendant, a drug-dealer, for five to ten minutes); but cf. Solomon v. Smith, 645 F.2d 1179, 1186 (2d Cir. 1981) (witness identification not sufficiently reliable when, inter alia, victim observed rapist for 10-15 minutes, but his face and head were partially obscured by a hood).

   The authorities described above emphasize that the Preclusion Motion should be denied without a hearing. If a witness is permitted to identify the defendant in court after seeing him for just 20-25 seconds, see Leonardi, 623 F.2d at 755, or four to five minutes, Kwong, 69 F.3d at 666, or after filling his gas tank, see Salameh, 152 F.3d at 126-27, it follows a fortiori that the Identifying Witnesses, who had extensive and direct interactions with Kassir, see supra, can be asked to identify him at trial.[12]

---

[12] United States v. Baccollo, 725 F.2d 170 (2d Cir. 1983) is also relevant here. In that case, in which the Second Circuit described the appeal as "plainly frivolous," id. at 172, the defendant-appellant argued that certain witnesses should not have been permitted to make an in-court identification without the District Court first holding a hearing. The Second Circuit disagreed, holding that it was an "adequate" and sufficient" answer to this argument to note that "[e]ach of the[] [witnesses] had seen the defendant in person and in action at approximately the time of the violations charged in the indictment." Id. at 173. So too here. Based on his actions in the Pacific Northwest during the period from fall 1999 to early 2000, Kassir has been charged with various crimes. See Ex. A (Indictment) at ¶¶ 5-17. During that precise period — at "the time of [certain of] the violations charged in the Indictment," Baccollo, 725 F.2d at 173 — the Identifying Witnesses saw Kassir "in person and in action." Id. Indeed, many of the Identifying Witnesses directly observed Kassir taking various "action[s]," id., over the course of many months, that constitute evidence that he is guilty of the crimes charged in Counts Three through Eight of the Indictment. See supra (noting that various Identifying Witnesses saw Kassir disseminating bomb-making materials, and conducting Jihad training sessions). Of course, as argued above, the fact that these witnesses saw Kassir "in person and in action" for a period of several months — rather than for a fleeting moment — further supports the argument that these witnesses should be allowed to make in-court identifications.

Finally, the Court should deny the defendant's request for a hearing on the

Preclusion Motion because such a hearing would be an inefficient use of judicial resources and,

in the circumstances of this case, would be inadvisable. See generally Ruggiero, 824 F. Supp. at

396 (noting that the District Court has discretion as to whether to hold a hearing on a motion to

preclude an in-court identification) (collecting cases).

A hearing on the Preclusion Motion would not be an efficient use of the Court's

time.[13] Such a hearing would concern the out-of-court identifications of the nine Identifying

Witnesses. But by the time the trial commences, the Government may determine that it will not

need to call all of these Witnesses. Similarly, the Government may not ask each Identifying

Witness who testifies at trial to identify Kassir.

More fundamentally, it is difficult to believe that identification of the defendant

will ultimately be an issue at trial. The Government intends to offer travel records that establish

that the defendant arrived in New York City with his wife and children in 1999, and departed

from Seattle in 2000. In addition, the Government intends to call various trial witnesses who

spent extensive time with Kassir in the United States and have described him with particularity

— but who have not been shown any photographs of the defendant. Finally, Kassir is, simply

put, unmistakable; the arrival of a physically-imposing, militant Lebanese-Swede in Seattle's

relatively small Muslim community was an event that made an impression on many observers,

---

[13] Many of the Identifying Witnesses were shown photographic arrays that were arguably suggestive, see Exhibit B (Discovery Letter) at 1-3 — but, as noted above, each of the Witnesses knew the defendant well enough to identify him in Court, regardless of the out-of-court identification procedures used. See supra. In these circumstances, at a hearing on the Preclusion Motion, the Government would not focus solely on the identification procedures that were used. Rather, the Government would seek affirmatively to establish how and under what circumstances the Identifying Witnesses got to know the defendant, and what the substance of their relationship was — W-1's arguing with the defendant about who was to be in charge of the Jihad training camp, for example, and W-10's receiving weapons training from Kassir.

-14-

including the Identifying Witnesses. It is not an efficient use of judicial resources to conduct a pre-trial hearing that will focus on what is likely to be a non-issue at trial — whether it was Kassir or someone else who came to Seattle, conducted Jihad training at the Seattle Mosque, and went on to Bly.

A pre-trial hearing on the Preclusion Motion would also be inadvisable. Conducting a Wade hearing in which up to nine non-law-enforcement witnesses are called upon to testify would be tantamount to providing to the defendant a partial witness list as well as a raft of Jencks Act material — before a trial date has even been set. But defendants are not generally entitled to obtain pre-trial witness lists from the Government, see, e.g., United States v. Bejasa, 904 F.2d 137, 139-140 (2d Cir. 1990) or to secure early disclosure of Jencks Act materials. See, e.g., In re United States, 834 F.2d 283, 286-87 (2d Cir.1987). These rules make good sense for criminal cases in general,[14] and they make especially good sense here. The defendant is accused of serious terrorism offenses, and one of his charged co-conspirators, Abu Hamza, has a truly global following — sending violent emissaries to the United States, a Jihadi to Afghanistan for training, and supporting a hostage-taking in Yemen. See Exhibit A (Indictment) passim. This is

_____

[14] As then-Judge Mukasey noted in the context of a public corruption case:

> The stakes in a criminal case are high, and the temptations of perjury, subornation and intimidation are ever present. Accordingly, the government is not required to turn over information that will permit a defendant to preview the government's case and tempt him to tailor proof to explain it away, or see to it that the government's proof is not presented.

United States v. Taormina, No. 97 CR. 1120 (MBM) 1998 WL 702341, at *4 (S.D.N.Y. Oct. 8, 1998) (collecting cases). Cf. United States v. Percevault, 490 F.2d 126, 132 (2d Cir. 1974) (describing Congressional concerns regarding "[f]ear of intimidation of witnesses and concern over efforts to suborn perjury" with regard to pre-trial disclosure of names of Government witnesses).

a case in which the felt "temptations of . . . intimidation," see supra n.14, are especially serious. Moreover, some prospective Government witnesses — whose names could readily come up in a pre-trial hearing on the defendant's Preclusion Motion — do not now live in the United States.[15]

*  *  *

All this said, should the Court determine to hold a hearing on the Preclusion Motion, the Government would respectfully request that the Court conduct such a hearing during trial. In particular, during trial the Government would provide substantial advance notice to the Court and defense counsel that a particular Identifying Witness will be called to testify, and that the Witness will be asked to identify the defendant in court. Before the Identifying Witness identifies the defendant, Your Honor could conduct a brief voir dire, outside of the hearing of the jury, to assess the extent of the Witness's relationship with the defendant and to determine whether the witness may identify Kassir in court.

This proposed procedure would not result in early disclosure of 3500 material or witness lists, in a case in which such disclosures would not be appropriate. See supra. Moreover, the proposed procedure will insure that the Court's time is not wasted. This is so for a number of reasons. First, a pre-trial hearing would likely focus on the relationship between Kassir and the nine Identifying Witnesses; during-trial voir dires would focus only on the relationship between Kassir and those of the Identifying Witnesses who are both to be called as

---

[15] It seems possible that the defendant's reason for filing the Preclusion Motion is as much to secure "free discovery" as it is to test the suggestiveness of out-of-court identifications. For example, the relevant Government discovery letter did not supply the four photographs that were shown to W-10 because these photographs were obtained by classified means. See Exhibit B (Discovery Letter) at 3 ("If you would like to review these photographs, once you receive your security clearances, please contact me to review copies of these photographs."). Although defense counsel now has obtained the requisite security clearances, the defendant filed the Preclusion Motion without first seeking even to review the photographs that W-10 was shown.

trial witnesses and asked to identify the defendant. In addition, with trial underway, the Court

and the parties will have a fuller and more fine-grained sense of the nature of the Government's

evidence against Kassir. Accordingly, the Court will be able to assess any particular Identifying

Witness's connection to Kassir more quickly at a mid-trial voir dire than in the context of a pre-

trial hearing. Finally, it is the Government's belief that, by the time trial is underway, the

question of whether it was Kassir who came to Seattle, lived at the Seattle Mosque, and traveled

to Bly, will not be an issue. See supra. Accordingly, deferring any hearing until the trial is

underway will help to insure that the Court will invest its time in resolving only those questions

that will have practical relevance to this case.

       The procedure suggested above — conducting a brief set of voir dires during trial,

away from the jury — is well-established. In United States v. Shakur, 560 F. Supp. 353

(S.D.N.Y. 1983) (Duffy, J.), for example, two defendants moved for an order precluding certain

witnesses from making an in-court identification based on asserted suggestiveness of pre-trial

identification procedures. The Court denied these motions, but indicated that a "voir dire will be

permitted outside of the hearing of the jury prior to [a certain witness's] formal identification of

the defendant." Id. at 355 & n.3; see also id. at 355-56 & n.4 (same ruling with respect to a

second witness's proposed in-court identification of the defendant); id. at 358 (same ruling with

respect to arguably suggestive aspects of a line-up). Numerous other courts have used the

procedure employed by Judge Duffy. See, e.g., Tortora, 30 F.3d at 336 (Wade hearing apparently

held immediately prior to in-court identification in Eastern District of New York trial);

Concepcion, 983 F.2d at 378 (describing a "Wade hearing held during trial" in Eastern District of

New York case); Ortega v. United States, 897 F. Supp. 771, 780 (S.D.N.Y. 1995) (Leisure, J.)

("if identification became an issue at trial, [the court] would conduct an evidentiary hearing to

-17-

assess whether any identification evidence was unduly and impermissibly suggestive"); United States v. Maher, No. 94 Cr. 606, 1995 WL 258194, at *4 (S.D.N.Y. May 2, 1995) (Stanton, J.) (concluding that factual issues on identification require a hearing, "perhaps on voir dire examination of the witnesses outside the jury's hearing, before they make their identifications at trial"); cf. Jackson, 589 F.2d at 109 (describing state court Wade hearing that took place the day before trial began); Sanchez, 603 F.3d at 382 (describing Wade hearing that took place "[i]mmediately before the trial").

For the reasons set forth above, should the Court determine to hold a hearing with respect to the Preclusion Motion, the Government would respectfully request that the Court hold a series of brief voir dires during trial, as Judge Duffy did in Shakur.[16]

**III.    The Defendant Has Withdrawn His Request For Relief Under Rule 12(d)(2)**

Next, the defendant moves for an order compelling the Government specifically to enumerate the evidence it intends to use in its case-in-chief pursuant to Federal Rule of Criminal Procedure 12(d)(2).  See Def. Memo at 3-5.  Defense counsel has advised the undersigned that Kassir is withdrawing this motion.

**IV.    The Government Consents To The Defendant's Reservation of Rights With Respect To A Jencks Act Motion**

The defendant seeks to reserve the right to request that all Jencks Act material be produced to him thirty days prior to the start of trial, on the ground that certain classified discovery has not yet been provided.  See Def. Memo at 6.  The Government consents to this

---

[16] The Law-Enforcement Witness, see supra n.3, observed Kassir sitting in a car during a traffic stop near Bly, and identified him from a photograph that was shown to him. This interaction with the defendant is much less substantial than the Identifying Witnesses'.  In this circumstance, should the Government seek to call the Law-Enforcement Witness as a trial witness and ask him to identify the defendant, the Government submits that a brief voir dire with respect to the Law-Enforcement Witness would be appropriate.

reservation of rights, and will respond on the merits to the defendant's request if a motion is in fact made.

## V.    The Defendant's 404(b) Motion Should Be Denied As Premature

Next, the defendant moves for an order precluding the Government from offering "prior bad acts" evidence. See Def. Memo at 7. This motion should be denied as premature. The Government has not yet disclosed what, if any "prior bad acts" evidence it will seek to elicit at trial — indeed, no schedule has yet been set for providing Rule 404(b) notice. See generally Fed. R. Evidence 404(b) (describing when "prior bad acts" evidence may be admitted and indicating that "upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial . . . of the general nature of any such evidence it intends to introduce at trial"). Should the Government want to introduce "prior bad acts" evidence, it will seek to do so only after providing the requisite "reasonable notice." In the time between the Government's provision of Rule 404(b) notice and the onset of trial, there will presumably be ample time for the defendant to press any objections he may have to the proffered evidence. Cf. United States v. Reddy, 190 F. Supp. 2d 558, 577 (S.D.N.Y. 2003) (Swain, J.) (directing the Government to make Rule 404(b) disclosure 45 days before trial based, in part, on the time that will be required by the defense to file appropriate motions in limine after the 404(b) notice has been provided); United States v. Livoti, 8 F. Supp.2d 246, 250 (S.D.N.Y. 1998) (Scheindlin, J.) (Rule 404(b) "notice must occur sufficiently in advance of trial that the Defendant has time to object to the evidence and the Court has adequate time to decide such an objection[.]").

## VI.    The Defendant's Roviaro Motion Should Be Denied As Moot

Kassir seeks the identity of, and impeachment evidence regarding, the

Government's confidential informants. See Def. Memo at 8-19 (citing, inter alia, Roviaro v. United States, 353 U.S. 53 (1957)). In this case, the Government has not made use of any confidential informants within the meaning of Roviaro.[17] Accordingly, the defendant's Roviaro motion should be denied as moot.

## VII.    The Government Will Provide The Requisite "Reasonable Notice" Under Rule 404(b)

Finally, the defendant seeks to compel the Government to provide notice of the evidence, if any, that it intends to offer under Rule 404(b). See Def. Memo at 20-21; see generally Fed. R. Evidence 404(b) ("upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial . . . of the general nature of any such evidence it intends to introduce at trial"). This motion should be denied as unnecessary. As noted above, see supra at Part V, the Government has represented that it will provide "reasonable notice," as required under Rule 404(b), in advance of seeking the introduction of any "prior bad acts" evidence.

## VIII.   Conclusion

For the reasons set forth above, the Preclusion Motion should be denied without a hearing, see Part II; the defendant's request for relief under Rule 12 should be denied because it has been withdrawn, see Part III; the Government consents to the defendant's reservation of rights with respect to a Jencks Act motion, see Part IV; the defendant's Rule 404(b) motions

---

[17] The Government expects that it will call at least one cooperating witness at trial. With respect to cooperating witnesses, the Government will comply with its obligations under the Jencks Act, as well as under the Constitution, as interpreted in Brady v. Maryland, 373 U.S. 83 (1965) and its progeny.

-20-

should be denied as premature, <u>see</u> Part V, and unnecessary, <u>see</u> Part VII; and the defendant's

<u>Roviaro</u> motion should be denied as moot.  <u>See</u> Part VI.

Dated: New York, New York
      June 19, 2008

                                  Respectfully Submitted,
                                  MICHAEL J. GARCIA
                                  United States Attorney

                By: _____
                                  Michael Farbiarz
                                  Assistant United States Attorney
                                  Tel. No.: (212) 637-1587

## CERTIFICATE OF SERVICE

MICHAEL FARBIARZ, pursuant to Title 28, United States Code, Section 1746, hereby declares under the penalty of perjury that a true and correct copy of the foregoing was served via electronic mail on the below-listed date on:

> Edgardo Ramos, Esq.
> Day Pitney
> 7 Times Square
> New York, NY 10036

and

> Mark S. DeMarco
> Attorney at Law
> 2027 Williamsbridge Road
> Bronx, NY 10461

Dated: New York, New York
      June 19, 2008

                                  Michael Farbiarz
                                  Assistant United States Attorney
                                  Tel. No.: (212) 637-1587